Filed 1/31/23  P. v. Nagata CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>STUART JOHN TSUNEO NAGATA,<br><br>  Defendant and Appellant. | F082198<br><br>(Super. Ct. No. 19CR-06497A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Carol K. Ash and Steven K. Slocum, Judges.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and John Merritt, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found Stuart John Tsuneo Nagata (defendant) guilty of first degree murder and attempted unlawful possession of ammunition.  The murder was alleged to be gang related for purposes of Penal Code section 186.22 (all undesignated statutory references

are to the Penal Code), but the jury rejected the allegation. Defendant now appeals based on the allegedly erroneous admission of prejudicial gang evidence at trial.

In his initial briefing, defendant challenged the denial of a pretrial motion to dismiss the gang enhancement pursuant to section 995. In the alternative, he assigned error to rulings concerning the nature and extent of the gang evidence admitted at trial and the trial court's modification of the pattern instruction regarding its permissible uses. Following the enactment of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), defendant asserted new claims in supplemental briefing based on changes to section 186.22 and the creation of section 1109, which provides for bifurcation of gang enhancement allegations upon a defendant's request.

Arguing section 1109 applies retroactively, defendant claims the trial court committed reversible error by denying his motion to bifurcate the trial of the gang enhancement allegations. We agree the bifurcation ruling was both erroneous and prejudicial. The judgment will therefore be reversed.

### FACTUAL AND PROCEDURAL BACKGROUND

*July 14, 2019*

On July 14, 2019, at 11:31 p.m., a 911 caller reported hearing gunshots near Merced Avenue in the City of Merced. The caller lived on Rose Avenue, which intersects with Merced Avenue, but his residence was approximately 15 houses away from the intersection and he was unable to provide further information.

A second 911 caller, F.G., requested police assistance at the 1300 block of Merced Avenue. He had also heard gunshots and could see "somebody laying down" in the street. When asked if there were any vehicles in the area, F.G. told the dispatcher, "There's a white ca— it was a—it was a white Cadillac. It's—I don't know if it's—if this is the car." A few questions later, the dispatcher asked, "Is the white Cadillac still parked there?" F.G. replied, "No, he took off. He took off. He's long gone." The next

question was, "Which way did the Cadillac go?" F.G. answered, "Going towards the Marriott out by the freeway by Motel Drive."

Police officers soon discovered the dead body of a 48-year-old man, Juan Ramirez (the victim). He was found lying on his stomach in the eastbound lane of Merced Avenue, near the address F.G. had provided to the dispatcher. An autopsy confirmed the victim sustained six bullet wounds, though one was characterized as a "graze wound." There was a front wound to the left shoulder and multiple posterior wounds, including one to the back of the head.

Investigators found 11 expended .40-caliber bullet casings and a bullet hole in a vehicle parked approximately 40 feet northwest of the victim's body, all in the vicinity of the 1400 block of Merced Avenue. It was determined the victim resided on the 1600 block of Merced Avenue, a considerable distance to the east of where he was evidently shot and killed. The police found no blood trails or droplets between the two locations.

*July 15, 2019*

In the early hours of July 15, 2019, a homicide detective conducted recorded interviews with F.G. and his friend, A.D. Another detective located video evidence captured by security cameras at the west end of Merced Avenue and along the northern stretch of Motel Drive. Later in the day, the police spoke to the victim's neighbors and executed a search warrant at the victim's home.

**F.G.'s Recorded Statements**

F.G. had been visiting A.D. on the night of the shooting. A.D. lived on Merced Avenue, approximately one block east of where the victim's body was found.

Late that evening, F.G. and A.D. had a strange encounter with an unidentified woman. F.G. described her as a "really skinny" Hispanic female with black hair and a tattoo on her left arm. She was approximately 19 or 20 years old, was sweating profusely, and appeared to be "on drugs." The woman had attempted to enter the house,

3.

and she seemed startled and/or frightened when F.G. opened the front door. She claimed to be looking for someone named "Jesse" before wandering off west on Merced Avenue.

F.G. exited the house and saw the woman behaving suspiciously outside of another residence. A.D. called the police, and officers came out to the neighborhood to investigate. The police departed after failing to locate the woman. Approximately 10 to 20 minutes later, F.G. and A.D. heard gunshots.[1]

F.G. recalled hearing a man "arguing with somebody" immediately prior to the shooting. He and A.D. hurried outside after hearing the shots, looked to their right (west), and saw a white car in the westbound lane of Merced Avenue. Although F.G. had said it was a Cadillac during the 911 call, he told the detective it was a two-door Chrysler. After further questioning about the make, model, and year, F.G. said, "I had told the cops 2015. But [A.D.] was like, 'No that had to be like, older—2005.['] And he pulled up a picture and it looked exactly the same as the car."

When F.G. first saw the white vehicle, its brake lights were illuminated. The car remained stationary for approximately five seconds before slowly proceeding to a stop sign at the intersection of Merced Avenue and Motel Drive, then it "took off fast."

**A.D.'s Recorded Statements**

A.D.'s statements were generally consistent with those of F.G. regarding the events preceding the shooting. After hearing gunfire, A.D. and some of his relatives exited the house behind F.G. to see what had happened. Similar to F.G.'s account, A.D. remembered running outside, looking to his right, and seeing the brake lights of a car in the westbound lane of Merced Avenue. But whereas F.G. had indicated the vehicle was

---

[1]F.G.'s statements about the police being in the neighborhood prior to the shooting were confirmed by officer testimony. F.G. and A.D. did contact the police to report a suspicious woman, and responding officers searched the area "roughly ten minutes before [the] shooting occurred."

stopped close to the body, A.D. said the car was approximately "two houses down" from it, meaning west of the body, "[r]ight before Rose Avenue."

The details provided by A.D. further differed from F.G.'s account in two significant respects. First, A.D. was certain the white car had turned onto Rose Avenue, i.e., "[t]he street before the stop sign." In other words, the vehicle did not traverse Motel Drive. Second, A.D. was "pretty sure" it was a four-door Cadillac CTS.

The detective asked A.D. if he had shown F.G. "a picture of a car" (presumably referring to the one F.G. described as looking "exactly the same" as the suspect vehicle), and A.D. responded affirmatively. He then showed the detective the results of a Google images search he had performed on his phone for the term "2006 cadillac cts." All the images were of four-door vehicles. The detective informed A.D. that F.G. had said he thought it was a Chrysler. A.D. replied, "He didn't—he didn't really see. He was more payin' attention to the [dead] body."

**Security Camera Footage**

A resident of the 1200 block of Merced Avenue had a video surveillance system with a camera mounted above his garage. The home was located between Rose Avenue and Almond Avenue (Rose to the east and Almond to the west), and the camera was pointed toward Merced Avenue. The grainy, low-resolution video feed showed cars passing by the house in the eastbound and westbound lanes of Merced Avenue. To a lesser extent, the feed also showed the headlights of vehicles traveling northwest and southeast on Motel Drive.

In reviewing the Merced Avenue video, the police saw a white- or light-colored two-door vehicle entering the neighborhood in the eastbound lane at approximately 11:22 p.m. A second white- or light-colored vehicle, which appeared to have four doors, passed by the camera in the eastbound lane at approximately 11:26 p.m. Next, at approximately

5.

11:29 p.m., a car resembling the previously seen two-door vehicle passed by the camera in the westbound lane.[2]

Security cameras at nearby businesses captured video of a white two-door vehicle traveling northwest on Motel Drive, toward State Highway 140 (also known as Yosemite Parkway), at approximately 11:30 p.m. Earlier footage from those cameras showed a white two-door vehicle traveling southeast on Motel Drive, toward Merced Avenue, between approximately 11:21 and 11:22 p.m.

Collectively, the videos appeared to show that a white two-door vehicle had entered the victim's neighborhood from Motel Drive at 11:22 p.m. and departed from the neighborhood via Motel Drive between 11:29 and 11:30 p.m.

**Neighbors' Statements**

Witness M.A. was contacted by the police at approximately 7:00 a.m. the day after the shooting. M.A.'s bedroom faced the victim's backyard, and she recalled waking up sometime "after midnight" to the sound of voices from that area. The voices were described "as being two males and one female." One of the males spoke in English, but the other two conversed in Spanish, and the female had seemed "kind of mad." M.A. did not report hearing any gunshots. When asked about vehicles, M.A. claimed to have previously seen a white car parked outside of the victim's home.

---

[2] A 24-hour screen clock showed the cars passing by at 23:21:28, 23:25:38, and 23:28:42. However, according to the police testimony, the clock was approximately one minute slow. This was a rough estimate, as the officer's comparison of the video clock to his "department-issued iPhone" was only in relation to the hour and minutes, not the hour, minutes, and seconds. For the sake of readability, most subsequent time references concerning video evidence are stated in a 12-hour format based on the approximations of the police witnesses. For example, video from a security camera at 11 West 15th Street in Merced captured footage of a moving vehicle at the purported date and time of "07/15/2019 13:59:22." But according to the police testimony, the video clock was about "14 hours and 38 minutes ahead of time." We will simply describe what the video showed on July 14, 2019, at approximately 11:21 p.m., without further noting or explaining the discrepancy.

Another neighbor, D.M., told the police she had seen the victim on July 14th "drinking beers with a light-skinned male and two female friends that were at his house." D.M. also claimed to have heard the victim "breaking bottles in the front yard" at approximately 10:00 p.m., i.e., 90 minutes prior to the shooting. A third neighbor, A.V., reported seeing the victim sometime between 5:00 p.m. and 7:00 p.m. on the day of the shooting. According to this witness, the victim had appeared drunk and angry, "and was throwing cans of beer against the wall."[3]

**Search of the Victim's Home**

Outside the victim's residence, along a walkway leading to the backyard, the police found the remnants of a food order from In-N-Out Burger. These items consisted of an upside-down French fry tray or serving boat, scattered fries, and a ketchup packet. Several aluminum cans were strewn about the same area.

Also found outside was a laminated key tag, such as might be used by a car dealership or body shop to keep track of multiple sets of keys. The preprinted strip of paper had blank spaces next to the words "Year," "Make," "Model," "Body" and "Color." Someone had scrawled "CADDY" in handwritten letters across the entire tag.

Inside the victim's home the police found photographs of defendant, a piece of mail addressed to defendant, and another document with his name on it. There was a receipt from a Big 5 sporting goods store dated July 1, 2019, for the purchase of a flashlight, golf balls, two pairs of shoes, and a $19 charge listed as "STD AMMO BCKGRND CK FEE." A separate document indicated the same store had initiated a background check for someone named Karla Perez within minutes of the transaction shown on the receipt.

---

[3]The information in this paragraph comes from the police testimony at the preliminary hearing. Witnesses D.M. and A.V. did not testify in court. According to the lead detective on the case, A.V. further reported that "a white Dodge four-door vehicle came to the [victim's] house" on the day of the shooting.

Other items found inside the residence included a packaged component of a medical neck brace. According to preliminary hearing testimony, there was also an eviction notice indicating the victim was being evicted.

*July 16, 2019*

By July 16, 2019, investigators knew defendant owned a 1999 Cadillac Eldorado and had determined the license plate number. It was a two-door car with white paint. While conducting a "grid search" in the nearby town of Planada, the police located the vehicle at the residence of a man named Felix.

Undercover law enforcement agents surveilled Felix's residence for the remainder of the day. A maroon- or burgundy-colored Buick eventually pulled up to the house. A man later identified as Martin Olvera was seen exiting the Buick and, a few minutes later, relocating to the driver's seat of the Cadillac.

At approximately 8:45 p.m., Olvera departed from Felix's residence in the Cadillac. The Buick, which was then occupied by two females, followed behind Olvera as he proceeded to State Highway 140. The undercover agents tailed both vehicles for approximately 15 minutes before police officers in marked cars effectuated a stop in the City of Merced.

Driving due west on State Highway 140 is the most direct path between where the Cadillac and Buick started and ended their journey. However, the vehicles took what the People describe as a "serpentine" route by detouring north on Plainsburg Road, west on Bear Creek Drive, and south on Arboleda Road. The cars resumed westbound travel on State Highway 140 at roughly the midway point between Planada and Merced.

The driver of the Buick is not identified in the record. The passenger was Annabelle Perez (Annabelle). Annabelle is the sister of Karla Perez (Karla), i.e., the person whose name and address were listed on a document found inside the victim's home.

Olvera and Annabelle were arrested during the traffic stop. Felix was arrested and interrogated the same evening. Over the course of two interviews (the second one was conducted two weeks later), Felix told multiple conflicting stories about defendant and Karla arriving at his Planada residence sometime between the afternoon of July 14, 2019, and the afternoon of July 15, 2019. In one version of events, Karla and defendant had told Felix they were at a casino on the evening of July 14, i.e., the night of the shooting.

A document found inside the Cadillac showed defendant to be its registered owner as of July 12, 2019. His registered address was on East Alexander Avenue in the City of Merced.

### Further Investigation

In late July, detectives obtained store surveillance video of the transaction documented on the Big 5 receipt found in the victim's home. The video showed defendant, Karla, and a man named Fernando Luna shopping together on July 1, 2019. Portions of the video showed defendant wearing a neck brace and being physically affectionate toward Karla. It also appeared to show him paying for the items listed on the receipt.

On July 29, 2019, Karla's then 17-year-old daughter, D.P., was hospitalized for alcohol intoxication and a stab wound sustained during an incident unrelated to this case. As the police had not yet located defendant or Karla, detectives went to the hospital to question D.P. about the victim's death. D.P. was still intoxicated at the time of the interview, which lasted approximately three hours.

D.P. claimed to have killed the victim herself while under the influence of alcohol, cocaine, and marijuana. She referred to the victim by his first name, describing him as "a Mexican man that my mom was renting a room from." D.P. then added, "Her and her boyfriend were living there." She also remarked that her mother's boyfriend "wears a neck brace."

9.

Although D.P. claimed to have shot the victim, her story conflicted with some of the physical evidence. The major discrepancy was in her account of the victim being shot "in the face" while inside his home and then going "into the road asking for help." But she did accurately describe the interior and exterior of the victim's residence, and she knew the shooting "happened, like, around 11:30 [p.m.] almost 11:31."

On July 30, 2019, detectives obtained security camera footage from Casino Merced, located at 1459 Martin Luther King Jr. Way in the City of Merced. One video showed Karla, Annabelle, defendant, and the victim in the casino on the night of the shooting. Defendant was wearing a neck brace. Exterior camera footage showed the group leaving together in defendant's Cadillac, with Karla behind the wheel, at approximately 11:10 p.m.

On July 31, 2019, detectives obtained surveillance video from a business located on West 15th Street, a few blocks east of Casino Merced. It showed a car resembling defendant's Cadillac approaching the intersection of 15th and G Streets at approximately 11:21 p.m. on the night of the shooting. After pausing for traffic, the car turned left and proceeded northbound on G Street.

In early August, the police obtained surveillance video from an In-N-Out Burger located across the street from Casino Merced. It showed defendant's Cadillac was in the drive-thru lane on the night of the shooting from approximately 11:11 p.m. to 11:18 p.m. The license plate was clearly visible in the footage.

***Defendant's Arrest and Prosecution***

The police eventually received information that defendant was in Tulare County. On August 10, 2019, a team of undercover officers apprehended defendant and Karla in the City of Lindsay. They were arrested outside of an apartment occupied by two adults and a small child. Some of defendant's belongings were found inside the apartment,

10.

including a neck brace. In addition, according to an arresting officer, a "broken" cell phone was found "in the restroom of that residence."[4]

In December 2019, Karla, Annabelle, Olvera, and defendant were named in a criminal information pertaining to the victim's death. Defendant and Karla were accused of premeditated murder (§§ 187, 189; count 1). Karla was also charged as an accessory after the fact, as were Annabelle and Olvera (§ 32; count 2). Defendant and Karla were further charged with attempted unlawful possession of ammunition (§§ 664, 30305; count 3).

All counts included gang enhancement allegations pleaded pursuant to a former version of section 186.22, subdivision (b). Defendant was further alleged to have personally used a firearm within the meaning of section 12022.53, subdivisions (b)–(d), and to have previously been convicted of a serious felony (§ 667, subd. (a)). The same prior conviction was alleged to constitute a strike for purposes of the "Three Strikes" law. (§§ 667, subds. (b)–(i), 1170.12.)

On January 7, 2020, the information was amended to delete an inapplicable reference to section 190.2. Three weeks later, defendant filed a motion under section 995 to set aside the information. On February 18, 2020, defendant's motion was granted as to the count 3 gang enhancement but denied in all other respects.

Defendant also filed motions to be tried separately from his codefendants and to bifurcate the trial of the gang enhancements. The trial court agreed to sever the case against Karla, but the motions were otherwise denied. A jury trial commenced on

---

[4]In their briefing, the People argue the "'smashed'" cell phone was especially probative of defendant being the victim's killer. It was the prosecutor who used the word "smashed," not the officer who testified. During closing argument, the prosecutor said, "Inside that residence was a smashed cell phone. [¶] I want you to ask yourself, ladies and gentlemen, why do people smash cell phones? There's obviously something on that cell phone that someone doesn't want other people to see." However, apart from the phone being located inside the apartment, there was no evidence it belonged to defendant. We note the officer testified defendant was "standing in front of the apartment" and using "his cell phone" immediately prior to his arrest.

February 25, 2020.  On March 19, 2020, the trial court declared a mistrial due to the COVID-19 pandemic.

Retrial began in September 2020 and continued into the following month. Defendant's renewed motions to be tried separately and to bifurcate the gang enhancement allegations were denied, as were several motions to limit the introduction of gang evidence.  Defendant, Olvera, and Annabelle were jointly tried before a single jury.

*Trial Evidence re:  Count 1*

A neighbor testified to seeing the victim outside his residence at approximately 10:30 p.m. on the night of the shooting.  The victim was "throwing beer bottles or cans around" and yelling to someone inside the house "that he just wanted to go for a ride." He seemed "really upset."  The witness did not know to whom he was speaking, but on prior occasions she had seen "two ladies and a gentleman that would usually let themselves into the home."  The man wore a neck brace, and the trio had come and gone in a white Cadillac that "looked like an Eldorado."

Video evidence clearly showed defendant, Karla, Annabelle, and the victim departing from Casino Merced in defendant's Cadillac on the night of the shooting.  The casino footage was edited to focus on the activity between 11:06 p.m. and 11:11 p.m. The evidence did not reveal when the group had arrived at the casino, but a detective testified to Karla's cell phone data showing her phone was "in the area of Casino Merced" from 11:00 p.m. to 11:19 p.m.  The same witness testified that Annabelle's cell phone data showed her phone was "in the area of Casino Merced" from 9:53 p.m. to 11:30 p.m.[5]

---

[5]The detective's exact testimony regarding Annabelle's phone was that, according to "information provided by T-Mobile for July 15th, 2019, from 0453 hours through 0630 hours Coordinated Universal Time, which converts to July 14th, 2019, from 2153 hours to 2330 hours Pacific Standard Time, this particular device was in the area of Casino Merced."  If the testimony was accurate, and assuming Annabelle had possession of her phone, this evidence conflicted with the People's theory that she was on Merced Avenue at the time of the shooting and witnessed the murder.

The In-N-Out Burger videos showed the Cadillac in the drive-thru lane from approximately 11:11 p.m. to 11:18 p.m.  According to the People's theory, the Cadillac then drove on West 15th Street, passing a security camera at 11:21 p.m. as it approached the G Street intersection.  It proceeded northbound on G, then east on 16th street, and eventually made its way to Motel Drive.  Between 11:21 and 11:22 p.m., the Cadillac traveled southeast on Motel Drive and entered the victim's neighborhood in the eastbound lane of Merced Avenue.

The People's trial exhibit No. 114 was a video consisting of seven minutes and 40 seconds of footage captured by the security camera on the 1200 block of Merced Avenue.  It depicted the activity there from approximately 11:22 p.m. until just prior to 11:30 p.m.  (See fn. 2, *ante*.)  The exhibit was a recording of the recording.  The detective who authenticated it explained there was a problem converting the video files from the homeowner's security system to a viewable format.  He improvised a solution: "I … used my department-issued iPod with the Axon Video Capture to actually record the monitor while I played the video [on the homeowner's equipment] so I could actually capture what was on screen."  The detective stopped recording when the video clock hit 23:28:47, which he explained was approximately one minute behind the actual time.[6]

Based on the Merced Avenue video and the In-N-Out Burger items found outside the victim's residence, the People argued Karla, Annabelle, defendant, and the victim arrived back at the victim's home at approximately 11:22 p.m.  The People theorized the victim had said or done something at the casino that made defendant feel disrespected, which led to an argument at the house.  Defendant was alleged to have shot the victim to

---

[6]The defense criticized the detective for failing to record the "three minutes" preceding the first 911 call.  The three-minute estimate assumed the video clock was not approximately one minute slow.  The detective conceded it was possible other cars had driven past the camera during the relevant time period.  He also testified to having attempted to review the original video again in preparation for the preliminary hearing, whereupon he discovered that it had been erased.

13.

death, but no theory was offered as to why the shooting occurred roughly two blocks away from the victim's home.

Witness M.A. was called to testify about waking up to the sound of people arguing on the night of the shooting. She was unsure of the time but again estimated it was "after midnight." She did not recall hearing any gunshots.

F.G. and A.D. both testified to having little memory of the incident. Their recorded interviews were played for the jury, as was F.G.'s 911 call. A police officer who had spoken to A.D. at the crime scene testified that he reported hearing someone say, prior to the shooting, "'Why are you mad?'" During the same conversation, A.D. claimed to have seen a 2005 or 2006 Cadillac CTS turn right onto Rose Avenue.

The 911 caller who lived on Rose Avenue, D.W., testified he was on his front porch when he heard the gunshots. He called 911 from inside his home approximately one minute later. The location of his garage obstructed his view such that he would not have seen a vehicle approaching from Merced Avenue before going into the house. There was also a period of approximately 45 to 60 seconds during which he would not have seen any vehicles that might have passed by his house. After calling 911 and returning to his porch, D.W. saw a police officer driving south on Rose Avenue toward Merced Avenue. He flagged down the officer and told him about the gunshots.

The People's theory was that Karla served as the getaway driver. She, Annabelle, and defendant were alleged to have fled the scene in defendant's Cadillac, passing multiple security cameras while heading northwest on Motel Drive at 11:30 p.m. However, the People's cell phone mapping expert testified the data for Karla's and Annabelle's phones showed both devices were one or two miles southwest of the crime scene at 11:30 p.m., "in the area of East Childs Avenue and Brantley Street." Upon further questioning, the witness explained the data was classified as having "a low

14.

confidence level," meaning the phones were more than 300 meters away from that location.[7]

Felix testified about the Cadillac being found at his home in Planada on Tuesday, July 16, 2019. Although he struggled with dates and times, the testimony indicated Karla and defendant had shown up at his house on the night of the shooting (Sunday) or in the early hours of July 15, 2019 (Monday). In his words, "[T]hey just wanted a place to rest—to rest their head. And I said that they could stay in my room, as I was in my mom's room … with another friend of mine. And I was—I was busy, that I didn't have time to talk to them, you know, but that they could spend the night. [¶] They stayed the night. That was it."[8] Felix admitted he was using methamphetamine on the dates in question.

Felix's testimony seemed to indicate Karla and defendant had arrived alone, i.e., without Annabelle. There was no mention of Annabelle being there until Monday afternoon. Annabelle's cell phone data reportedly showed her device was in Planada at 5:19 a.m. Monday morning. Felix referred to a lunch conversation from that day, during which plans were made for him, Karla, Annabelle, and defendant to go to a casino. But then Olvera "happened to show up" and Felix "didn't want to go anymore because [he] did not want to be, like, a fifth wheel." For reasons not explained, Felix let them borrow his car and the Cadillac was left at his house. He admitted to placing some type of covering over the Cadillac at Karla's request.

---

[7]It was never explained why Annabelle's cell phone data reportedly showed her device in two locations at the same time, i.e., "in the area of Casino Merced" and "in the area of East Childs Avenue and Brantley Street." (See fn. 5, *ante*.)

[8] Felix testified the person with Karla was introduced to him as "Chino" or "Gino." When asked to make a courtroom identification of defendant, Felix denied recognizing him. Later in the trial, Karla's daughter and a defense witness both testified to knowing defendant by the nickname "Chino."

15.

Karla and defendant did not return to Felix's home. Felix did not see Annabelle or Olvera again until Tuesday, when they finally brought his vehicle back and took possession of the Cadillac. Annabelle's cell phone data showed her device had traveled south on Monday night, registering with cell towers in Madera at 10:44 p.m. and in Tulare County at 11:59 p.m.

Karla's daughter, D.P., testified pursuant to a grant of immunity after invoking her constitutional right against self-incrimination. She denied ever meeting the victim or discussing his murder with Karla or defendant. D.P. also denied remembering what she had said during her hospital interview. A recording of the interview was played for the jury.

Through cross-examination of the lead detective, counsel for Olvera and Annabelle suggested D.P. may have been the Hispanic female that F.G. and A.D. reported seeing prior to the shooting. The detective admitted to having considered this possibility, saying it was why he had asked D.P. what she wore that evening. During her interview, D.P. claimed to have been wearing pants and a black sweater. F.G. had described a person wearing shorts and a white tank top. The detective also testified that D.P.'s phone records "don't put her in that area" on July 14, 2019.[9]

### Trial Evidence re: Count 3

To prove attempted possession of ammunition by a felon, the People introduced the Big 5 video and related documents found inside the victim's home. The assistant manager who handled the transaction testified. Defendant stipulated to having an unspecified prior felony conviction.

The video showed Karla bringing two boxes of shoes to a counter near the cash register and conversing with the assistant manager. Defendant and Fernando Luna moved in and out of the camera's view as this was happening. Luna then joined Karla at

---

[9]The testimony regarding D.P.'s phone records was hearsay, but it was elicited by defendant without any objections from the other parties.

16.

the counter for about 60 seconds, during which time defendant was somewhere off screen. When defendant returned, he and Luna began playing with a flashlight and laughing about it. As Karla continued to speak with the assistant manager, defendant and Luna interacted with another employee. The assistant manager then went into a back room for about three minutes.

While the assistant manager was gone, defendant and Luna interacted with Karla, talked to the other employee, and looked at various merchandise. When the assistant manager returned, the trio congregated near the register and spoke to both employees. There was a subsequent period of one-on-one communication between defendant and the assistant manager, and he appeared to tender a payment.

The assistant manager's testimony briefly explained what was happening in the video. She referred to defendant as the "gentleman with the neck brace" and to Luna as the "shorter Hispanic male." Her interactions with Karla concerned a prerequisite background check for the sale of ammunition. The witness recalled Karla filling out "the paperwork to do that," and Luna asking "a few questions as far as the ammunition and what caliber." She added, "I don't remember what specifically—what specific calibers they were."

On cross-examination, defendant asked if Karla had inquired about a "specific kind of ammunition." The witness did not remember, and defendant said, "[W]ould it ring a bell if I—was it 9 millimeter ammunition?" The witness replied, "In the area that she was, it was either 9, .38 Special, or .40."

Olvera's counsel asked the witness to confirm there was "no attempt by either of the males to purchase ammunition." She responded, "There was. Just not by the taller gentleman with the neck brace. The shorter Hispanic male was the one asking about the ammunition."

17.

### Trial Evidence re:  Gang Allegations

Defendant was alleged to have killed the victim after being publicly disrespected by him at Casino Merced.  The preliminary facts of a public dispute and defendant feeling disrespected were supposedly inferable from the Casino Merced videos.  (See further discussion, *post*.)  The victim had no known involvement with gangs, but defendant was shown to be "a high-ranking Nuestra Familia criminal street gang member."

According to expert testimony, Nuestra Familia or "NF" is a criminal street gang with multiple levels of membership.  Affiliates are commonly known as Northerners or Norteños, but those terms technically refer to a certain status or membership level.  Nuestra Familia is both the name of the organization and the highest level of membership therein.  The next level down is variously known as the "Northern Structure," "Nuestra Raza," and "Norteños Soldados" (abbreviated as "N-Sols").  Below that are the Norteños.  As explained at trial, "Norteños are people that still are part of the cause or part of the Nuestra Familia, but they're lower level and haven't been selected or they haven't committed to being investigated [for advancement in the hierarchy]."  Norteños may subdivide into smaller groups ("subsets") outside of the prison system, but "eventually it all leads up to Nuestra Familia."

Nuestra Familia's primary activities reportedly include murder, carjacking, witness intimidation, "major narcotic trafficking," and "[a]nything to do with violence."  Murder, if committed against a gang rival, benefits NF by helping it maintain a reputation for violence and instilling fear and intimidation in others.  The prosecution asked an expert witness if murdering someone not affiliated with gangs is also beneficial to NF.  The expert replied, "Yes.  If there was a reason for the homicide that they can articulate, then yes, it would benefit the gang as well."  He then gave the example of an NF member reporting to his superiors that a victim "'totally disrespected me or disrespected the

gang,'" in which case "that murder would be authorized."  In other testimony, the expert noted the importance of respect in NF gang culture.

Two gang experts opined defendant had attained the status of "Carnal" ("Brother") and was thus a "full-fledged member of the Nuestra Familia."  According to one expert, "the NF has three categories of Carnals …[:]  Cat-1, Cat-2, Cat-3."  He opined defendant was at least a "Cat-2 NF member," meaning he was involved in the overall management of the gang.  The expert opinions regarding defendant's NF status were based on a recorded telephone conversation and photographs of defendant in the company of "Cat-3 NF members."[10]  The phone conversation was played for the jurors and explained to them through the testimony of a special agent with the FBI.

The phone call had been intercepted during a wiretapping operation conducted in November 2017.  It was a conversation between defendant and a higher ranking NF member.  They discussed large-scale trafficking of methamphetamine and heroin, including a purchase that would require "about a 100 G's."  The conversation shifted to the topic of postponing or cancelling previously made plans to kill two women who had stolen money from the organization.  Also discussed was an NF investigation of a lower level member for possible removal from the gang.  It was said they would "hit him" if the findings were negative, which the expert testified meant some degree of physical assault and "could mean death."

As further evidence of his gang membership, the People introduced photographs of defendant's tattoos.  The only tattoo directly related to NF was of the number 14, inked in large Roman numerals across defendant's stomach and upper abdomen.  According to expert testimony, references to this number are "predominant throughout the entire organization" because the 14th letter of the alphabet is N.  The expert explained,

---

[10]The People's briefing erroneously states the photographs were found inside the victim's home.  The photos were located during a probation search at a different address in April 2018, nearly 15 months prior to the shooting.  The jury was not told when or how the photographs were obtained.

19.

"Anything that you can kind of put the, you know, emphasis on the N or the F could be used to represent the Nuestra Familia."

A tattoo of the word "murder" across defendant's left forearm was deemed relevant because murder is one of Nuestra Familia's primary activities. This and several other tattoos were held admissible for the dual purpose of proving the gang enhancement allegations and showing "motive and identity of the shooter." Defendant's arguments for exclusion pursuant to Evidence Code section 352 were rejected.

The prosecutor repeatedly displayed and referenced a tattoo on defendant's chest of someone holding a gun to the back of a man's head, just behind the right ear. When the gang expert was asked about it, he noted defendant also had tattoos of dollar signs and the word "money," opining they were collectively "indicative of gang behavior" but did not specifically pertain to Nuestra Familia. During closing argument, the prosecutor asked the jury to "remember the tattoo on [defendant]'s chest that depicts someone being shot in the back of the head, the exact same manner in which [the victim] was killed."

The jury also saw a tattoo on defendant's right hand that said "get MAD" and another on his left hand that said "go BAD." A handgun was tattooed above the words on his left hand. One of the gang experts interpreted this as "indicating that when he gets mad, it'll go bad. So there's a propensity for violence if things go wrong." The trial court sustained an objection to this testimony and ordered it stricken, but the prosecutor was allowed to rephrase the question as follows: "So you're saying someone with a tattoo, based on your knowledge of criminal street gangs, like this would be signifying that if they get mad, they go bad?" The witness answered, "Right. That—that's what that would indicate to me, that that person would."

To establish a "pattern of criminal gang activity" (§ 186.22, former subd. (e)), the People relied on the prior convictions of two gang members, one of whom was Fernando Luna. The jury learned this was the same person seen on the Big 5 video shopping with defendant and Karla on July 1, 2019. Luna was arrested on July 13, 2019, one day prior

20.

to the victim's murder, and he was convicted of unlawful possession of a firearm.  It was further revealed that codefendant Olvera was with Luna at the time of Luna's arrest.

***Verdicts and Sentencing***

The jury began deliberating on Thursday, October 8, 2020, at approximately 3:33 p.m.  It recessed for the day at 4:44 p.m.  Deliberations resumed on Friday, lasting from 10:00 a.m. to 4:00 p.m.  There was an afternoon request for a readback of Felix's testimony and that of the neighbor who testified to seeing the victim outside of his house on the night of the shooting.  At 3:48 p.m., the jury submitted the following question:  "If [defendant] is not found guilty can Anabelle … and … Olvera be found guilty of accessory after the fact?"

The jury returned from a three-day weekend on Tuesday, October 13, 2020.  Deliberations lasted from approximately 10:24 a.m. to 4:07 p.m.  Late that afternoon, a request was submitted for "pictures of … Olvera's tattoos."  The trial court referred the jury to "Exhibit 383," which the trial transcript describes as showing tattoos of the word "Merced," an "Aztec numeral" indicative of membership in a Norteño subset, and an image of "someone pointing a gun."

On Wednesday, October 14, 2020, the jury deliberated for approximately 4.5 hours before returning its verdicts.  Defendant was found guilty of first degree murder and attempted unlawful possession of ammunition as alleged in counts 1 and 3.  He was also found liable for personal discharge of a firearm under section 12022.53, subdivision (d).  The gang enhancement allegations were rejected as not true.

Annabelle and Olvera were found guilty of being accessories after the fact.  As to both these codefendants, the gang enhancement allegations were found true.

In a bifurcated proceeding, defendant admitted the prior strike and serious felony conviction allegations.  He later filed a motion for new trial, which was denied.

In December 2020, defendant was sentenced to an aggregate prison term of 80 years to life.  He received 25 years to life for the murder conviction, which was doubled

because of the prior strike. A consecutive term of 25 years to life was imposed for the firearm enhancement, plus another five years for the prior serious felony conviction. A concurrent upper term sentence was imposed for count 3. The notice of appeal was filed on the date of sentencing.

## DISCUSSION

Defendant challenges the denial of his section 995 motion regarding the gang enhancement for count 1. He relies on the holdings of *People v. Prunty* (2015) 62 Cal.4th 59 and *People v. Ramirez* (2016) 244 Cal.App.4th 800 (*Ramirez*). Although the jury found the gang allegations not true, defendant argues the error directly resulted in the admission of prejudicial evidence. Alternatively, defendant claims "the sheer volume and inflammatory nature of that evidence would have been improper even if the gang enhancement had justifiably been before the jury." He further alleges instructional error regarding the use of the gang evidence to prove identity.

In supplemental briefing, defendant relies on Assembly Bill 333's changes to section 186.22. He argues those changes apply retroactively and bolster his challenge to the section 995 ruling. In further supplemental briefing, defendant relies on Assembly Bill 333's enactment of section 1109. Arguing section 1109 also applies retroactively, he claims the denial of his motion to bifurcate the gang enhancement allegations was a reversible error.

We agree with defendant's section 1109 claim. The People dispute the claim on the merits and also argue harmless error. Because the harmless error analysis turns on the cross-admissibility of the gang evidence, we will address defendant's reliance on *Ramirez* and his arguments regarding the People's theory of a gang motive (collectively, the *Ramirez* claim). We also consider whether the evidence of defendant's tattoos was admissible to prove identity. Defendant's remaining claims need not be resolved.

# I. Denial of Section 995 Motion

## A. The *Ramirez* Claim

### 1. Overview

Section 186.22 provides for enhanced punishment of gang-related crimes. A gang-related felony is one "committed for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)(1); see *People v. Albillar* (2010) 51 Cal.4th 47, 60.) The statute also requires "the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).) These elements are sometimes described as the first and second "prongs" of the enhancement provision. (E.g., *People v. Renteria* (2022) 13 Cal.5th 951, 964.)

In *Ramirez*, Jerry Ramirez and his girlfriend, Catherine Villarreal, were respectively accused of attempted murder and aggravated assault. Those counts included gang enhancement allegations, and the pair were also charged with unlawful participation in a criminal street gang (§ 186.22, subd. (a)). All counts stemmed from an incident during which Villarreal had allegedly struck her neighbor with a baseball bat. The neighbor's brother got involved, and Ramirez shot him with a firearm. (*Ramirez*, *supra*, 244 Cal.App.4th at pp. 803–804.)

At the preliminary hearing, a gang expert opined that Ramirez was a Sureño gang member. (*Ramirez*, *supra*, 244 Cal.App.4th at p. 808.) The expert concluded Villarreal was a Sureño "associate" based on her intimate relationship with Ramirez. (*Id.* at p. 809.) The expert's opinions regarding the first prong of the gang enhancement were as follows:

> "'This alleged crime benefits the Surenos. The more violent crime Sureno gang members are willing to commit, the larger their reputation will grow. In gang subculture, violent crimes are revered and encouraged when compared to the general public they would be frowned upon. This reputation increases intimidation that the gang is able to employ over other people, the general public, other gangs, and even to law enforcement. If a gang or a gang member has such a large reputation as being willing to commit a violent crime such as shooting somebody in the face, there's a

23.

very good chance that nobody is going to report this person, try to contact this person, and stop him from committing any criminal activity.'" (*Id*. at pp. 808–809.)

After being held to answer on all charges, Ramirez and Villarreal unsuccessfully moved for relief under section 995. (*Ramirez*, *supra*, 244 Cal.App.4th at pp. 811–812.) They were later acquitted of the substantive gang offense. Both were convicted on the remaining counts, but "the jury rejected gang sentencing enhancement allegations that the attempted murder and the assault were committed for the benefit of the Sureños." (*Id*. at p. 803.) Ramirez and Villarreal appealed, challenging the denial of their section 995 motion as to gang allegations.

The appellate court agreed the section 995 motion was erroneously denied. As relevant here, the expert's opinion testimony regarding the first prong of the gang enhancement was described as "purely conclusory and factually unsupported." (*Ramirez*, *supra*, 244 Cal.App.4th at p. 819.) "For example, no gang signs were flashed, no gang names were called out, and no gang attire was worn. Plus, while there [was] some evidence Ramirez actually is a gang member and Villarreal might be a gang sympathizer, there [was] no evidence [the victims] are gang members. Likewise, there [was] no evidence the disputes between [the victims] on the one hand, and Ramirez and Villarreal on the other, had anything to do with any gang." (*Ibid*.) "Consequently, the preliminary hearing evidence was insufficient to support the section 186.22(b)(1) gang enhancement allegations." (*Id*. at p. 820.)

Although the jury ultimately rejected the gang allegations, the *Ramirez* court held the erroneous section 995 ruling was prejudicial under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*Ramirez*, *supra*, 244 Cal.App.4th at pp. 820, 822.) In other words, there was "a reasonable probability defendants would have achieved a more favorable result on the attempted murder and assault charges if the section 995 motion had been granted and the gang evidence had been excluded." (*Id*. at p. 822.) The trial evidence "presented the jury with two plausible factual scenarios," one of which was

24.

based on Ramirez's own testimony and supported his claim of self-defense and defense of others. (*Id*. at p. 821.) There was "a substantial likelihood the jury's evaluation of his credibility was colored by the gang evidence admitted at trial." (*Ibid*.)

The prosecution's gang expert had "repeated most of his preliminary hearing testimony, but with more detail." (*Ramirez*, *supra*, 244 Cal.App.4th at p. 821.) He discussed the Sureños' involvement in "'everything from attempted murder, robbery, extortion, narcotics, trafficking, narcotic sales, possession of firearms, possession of loaded firearms, kidnapping, false imprisonment, grand theft auto, basically any crime.'" (*Id*. at p. 822.) The appellate court held "[n]one of this gang evidence was relevant to the attempted murder and assault charges, but its potential prejudicial effect upon them was manifest. … It also tended to impermissibly show defendants' bad character as a means of creating an inference they committed these charged offenses." (*Ibid*.)

### 2. *Additional Background*

#### a. **The Preliminary Hearing**

At defendant's preliminary hearing, the People introduced four video clips recorded at Casino Merced on the night in question. The main clip provided a wide view of the casino floor, showing the interactions between Karla, Annabelle, defendant, and the victim shortly before their departure. A second clip of interior footage showed each of them exiting through the front door of the building. The third video, recorded by an exterior camera, briefly showed them walking toward the parking lot. The fourth video showed them approaching the Cadillac, getting inside, and driving away.[11]

---

[11]Based on the time estimates stated in the preliminary hearing transcript, it appears two of the clips were identical to People's trial exhibits Nos. 102 and 103. The clip of the casino floor was estimated to be "3 minutes and 51 seconds," which is approximately 75 seconds longer than the corresponding trial exhibit (No. 196). However, it is clear from witness testimony that the salient footage from the preliminary hearing video is the same as was introduced at trial. The preliminary hearing video of the group entering the Cadillac was estimated to be "1 minute, 38 seconds," which is a few seconds shorter than the corresponding trial exhibit (No. 104).

At 22:08:15 on the video clock, defendant is seated at a card table. He is wearing a neck brace. The victim is standing behind him, wearing a dark hat and stroking his chin. Karla is standing next to defendant, on his left. Defendant picks up a rack of casino chips and rises out of the chair, removing himself from the game. Karla and the victim gather near him, and it becomes apparent that Annabelle has been seated at a different table nearby. Annabelle stands up and joins the group, and they move to a small circular drink table. Defendant and the victim are both holding bottles of beer.

There is no audio, but when the video clock reads 22:09:01, the victim appears to be speaking to Annabelle. A moment later, Annabelle lurches slightly forward. She may have been laughing, as indicated by the contemporaneous movements of Karla and the victim. As the victim turns his back to Annabelle and takes a few steps forward, Karla swats at his back and, as fairly described in defendant's briefing, makes a "playful" and exaggerated kicking gesture toward his rear end.

Between approximately 22:09:07 and 22:09:15 on the video clock, the victim strides back toward the circular table and past it, walking between Annabelle and Karla and returning to near where he had been standing when defendant was still gambling. Karla, meanwhile, takes a few steps toward the nearest blackjack table and sets her purse down next to a patron wearing a sleeveless top, R.Z. Although not disclosed in the preliminary hearing testimony, it came out at trial that R.Z. is a cousin of Karla and Annabelle.

At 22:09:16 on the video clock, the victim's head is turned and he appears to be speaking to a casino employee. The employee soon begins wandering about the area, and the victim continues to speak and make occasional gestures. This goes on for about 15 seconds, but it is impossible to determine whether he is talking to himself, the employee, R.Z., Karla, Annabelle, defendant, or a combination of all the above. Defendant has not yet moved from his spot at the drink table.

26.

At approximately 22:09:28 on the video clock, defendant appears to be conversing with Annabelle, who has been standing to his right. Karla is a short distance from Annabelle's right and is standing next to R.Z., who is still seated at the blackjack table. R.Z. is located to Karla's right and to the left of the victim. During the next 10 seconds defendant moves to his left, circling toward Karla while still looking at, and seemingly talking to, Annabelle. As defendant gets closer to Karla, he appears to be looking in the general direction of her and the victim. In a fluid sequence of movements, Karla appears to say something to R.Z. before turning and moving slightly toward defendant. As this happens, the victim walks back toward the group and rejoins them.

Next, at 22:09:40 on the video clock, R.Z.'s head is turned toward the group and she raises her right arm and hand. Immediately thereafter, defendant raises his left arm and hand. He then begins walking toward the front of the casino with Karla, the victim, and Annabelle following behind him—in that order. Between 22:09:44 and 22:09:45, defendant turns and raises his left arm again, possibly pointing with his index finger. The group proceeds to the end of the casino floor, near the exit, and defendant speaks with an employee in a purple shirt.

During the preliminary hearing, R.Z. testified to having raised her hand to say goodbye to defendant. She understood defendant's act of raising his hand as him saying goodbye to her. R.Z. was not specifically questioned about defendant raising his hand the second time. When asked if she had observed any confrontations or signs of hostility between defendant and the victim, she answered, "None whatsoever."

At approximately 22:09:53 on the video clock, defendant begins walking back toward the drink table with the employee in the purple shirt. Karla, Annabelle, and the victim stand by waiting for him. Defendant proceeds to the cashier's window, and the employee turns off in another direction. After looking inside of a drawer, the employee appears to say something to defendant from across the room. As this is happening, Karla and Annabelle begin walking to the front door. The victim remains where he has been

27.

standing, continuing to drink his beer. At approximately 22:10:27, defendant finishes up at the cashier's window and begins making his way to the exit. He pauses to interact with a few patrons, shaking one person's hand and giving a two-fingered "peace sign" to two others. At approximately 22:10:48, he and the victim meet up at the front door.

In the next video clip, defendant walks out the front door and holds it open for the victim as the victim exits. The third video briefly shows them walking to the parking lot together, engaged in conversation. In the last video, Karla is seen opening the driver's side door of the Cadillac and standing there as Annabelle climbs into the back seat. When defendant and the victim come into view, defendant makes a gesture with his arms resembling a baseball umpire's signal for "safe." He swings his arms in a similar fashion a few moments later as he and the victim approach the passenger side of the Cadillac. Defendant opens the door and waits for the victim to get into the back seat, then he sits down in the front passenger seat.

According to police testimony, additional footage from Casino Merced appeared to show defendant buying the victim a beer. This was consistent with the testimony of another eyewitness, J.S. Visible in the bottom middle portion of the casino floor video, wearing a yellow top, J.S. was the last person defendant waved at before leaving the building. As a regular patron of the casino, J.S. knew Karla, Annabelle, defendant, and the victim from seeing them there on prior occasions. J.S. denied observing any confrontations that evening between anyone in defendant's group. She did recall defendant buying drinks for the victim.

The defense questioned the lead homicide detective about his interviews with four Casino Merced employees. Some of them had specific recollections of interacting with defendant that night, but none recalled any type of argument, altercation, or "any kind of hostilities" between him and the victim, nor any type of gang talk. One of the employees, upon being shown the relevant footage, had repeatedly asked the detective, "What [am I] supposed to be looking for?"

Officer Steven Odom of the Merced Police Department testified as the People's gang expert. He opined that defendant and Karla were both gang members and Annabelle was a gang "associate." He also testified to his personal interpretation of the Casino Merced videos.

Officer Odom testified to believing the video of the casino floor showed the victim "challenging or disrespecting" defendant. This prompted multiple objections and extensive debate over the admissibility of such opinions. The magistrate eventually said, "I am going to reserve and listen to the testimony and decide whether or not there was anything that this witness can offer as an expert. Okay. So it's reserved."

The testimony resumed as follows: "Well, you can see [defendant] and [the victim] almost simultaneously come together. And that's when Karla steps in between them both. [Defendant] raises his hand and points at [the victim], appears to say something. Don't know. No audio. He then appears to exit, turns back around, points a second time towards [the victim]."

Officer Odom was asked about the significance of "those gestures … as it relates to the gang." He responded: "Well, [defendant], knowing his high ranking gang status, an individual who is obviously speaking to [defendant], disrespecting him to where [defendant] is pointing a finger at him, twice; viewing all the gang assault videos I have watched, videos involving gang members, it's my opinion." The prosecutor followed up, "That it was a hostile gesture?" The witness answered, "I believe that. Yes."

When defense counsel asked Officer Odom to consider the gesture by R.Z. that preceded defendant raising his hand the first time, Officer Odom did not change his opinion. He theorized R.Z. was waving to Karla, claiming the video shows that Karla "taps [R.Z.] on the back of the—the back, [to indicate] that she's leaving. And then [R.Z.] points her hand up to acknowledge as she's leaving."[12]

---

[12]The video is reasonably interpreted as showing Karla reaching out and tapping R.Z. to say goodbye at approximately 22:09:36 on the video clock. However, R.Z. does not raise her

Officer Odom also testified to the significance of defendant being disrespected in a public place: "[I]n my experience, status and reputation is what a gang member lives by. And if you are an NF member, you are the highest of the highest. You are not a normal Norteño, status that Norteños sometimes will never achieve. So that status, that reputation to continue to live by and hold if you are disrespected in public, you are going to respond." He further opined "the altercation that occurred in the casino" continued as defendant and the victim walked out to the car. Officer Odom interpreted the "umpire safe gesture" to mean defendant was telling the victim, "'Stop. It's done. It's finished.'"

The magistrate ultimately excluded and ruled inadmissible all testimony about whether defendant felt disrespected. The magistrate explained, "I think the witness can testify, based on his opinion, based on these gestures, that he has an opinion there was a conflict. But he can't testify about the person's mental state and, therefore, based on his opinion, based on the video, that there is a conflict, this could result in some type of gang culture response." The expert's testimony regarding the importance of respect in gang culture was held admissible.

On further direct examination, the following testimony was elicited:

"Q. Does committing an assault or homicide benefit the gang?

"A. Yes.

"Q. How so?

"A. Instills fear in the community, in their rivals, in law enforcement that the gang is not to be disrespected, gang is to be feared. Gangs want to be the most powerful violent gang.

"Q. Does it also benefit individual gang members?

"A. Definitely.

---

hand until four seconds later, and when she does, Karla is turned around with her back facing her. Of the four people in defendant's group, the only person facing R.Z. is defendant. Karla and the victim are looking the other way, and their bodies obscure Annabelle's face from view.

"Q. How?

"A. As I said earlier, gang members and their status, reputation is what they live by. So if they have higher status, they want to continue to keep that status, high and respected. So it will benefit their gang or that gang member by keeping their status where it is or elevating one's status."

The prosecutor later described a hypothetical scenario in which a "Nuestra Familia member shoots and kills a person who has disrespected him." The following testimony was given in relation thereto:

"Q. How do the crimes in that hypothetical benefit the gang?

"A. The crime of murder benefits the gang tremendously.

"Q. And is that because of—for the reasons that you stated before that it instills fear in the community and rivals?

"A. And that they are not to be disrespected."

On cross-examination, Officer Odom was asked to explain what he perceived to be the act of disrespect by the victim. The witness answered, "Well, it's the totality of that video when you watch everything." When pressed to identify the evidence upon which his opinions were based, Officer Odom claimed defendant had a "very serious" look on his face and again relied on the finger pointing. The witness also said that a gang member's response to "conflict and argument" is "not always what we [lay people] interpret the typical idea of angry to appear to be," but he conceded that he is not a body language expert.

Defendant was held to answer to the gang enhancements on counts 1 and 3 based on the first prong being satisfied by evidence the crimes were "committed in association with a criminal street gang." Although not specifically tied to the theory of acting for the benefit of a gang, the magistrate also made these findings: "There's some evidence, although slight, in my opinion, of a conflict between [defendant] and [the victim] at the casino. But, more importantly, witnesses who spoke to law enforcement at the scene of

31.

the crime described there being a commotion prior to the shooting, both at the [victim's residence] and down the street."

### b.      Section 995 Motion and Ruling

In moving to set aside the gang enhancements, defendant relied, inter alia, on *Ramirez* and *People v. Albarran* (2007) 149 Cal.App.4th 214. The motion was heard on February 10, 2020, with the trial court tentatively ruling to deny it except as to the gang enhancement alleged for count 3. The stated reasoning for denial as to count 1 was, in pertinent part, as follows:

> "There's two prongs, obviously, to the gang enhancement. First, you have to find the crime benefited the Nortenos and benefited their reputation. In *Ramirez* cited by [defendant], the Court in that case found insufficient evidence even at a preliminary hearing where no gang signs were flashed, no gang names were shouted out. There was no evidence of gang attire. Victim wasn't a gang member, and there was no evidence that the dispute between the victim and the defendants had anything to do with the gang. I think the distinction in this case that we do have Officer Odom's testimony that the motive for the shooting or his interpretation of what he saw in the video, that it was a gang related disrespect of a high ranking NF member, [defendant]. It was in a public place where several people knew [defendant], and that's even shown by [defendant]'s own witnesses, who testified: [J.S.] and [R.Z.]. So I think for purposes of the preliminary hearing, there's sufficient evidence as to the first prong. [Defendant] also cited *People v. Albarran*, and that's a 2007 case. … That case was dealing with sufficient evidence at trial, not a preliminary hearing. And in that case, the expert conceded he didn't know the motive. He had just heard there were gang members at some private birthday party where the shooting took place. I think that's different than this case and the evidence that was presented at the preliminary hearing. So I think the first prong was satisfied."[13]

---

[13]In *Albarran*, "the prosecutor argued the motive for the shooting was to gain respect and enhance the shooter's reputation—essentially to 'earn one's bones' within the gang (i.e., the respect motive)." (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 227.) In a pretrial hearing, the prosecution's gang expert conceded "he did not know the exact reason for the shooting" but opined "the offenses were gang related because there were two shooters involved, and the crime would intimidate people." (*Id*. at p. 220.) At trial, the same expert conceded the perpetrators had done nothing to identify themselves as gang members or implicate their gang in the shooting. "Nonetheless [the expert] insisted that the shooters would gain respect within the gang absent

32.

On February 18, 2020, after hearing further argument on defendant's motion, the trial court made these statements: "Well, I would agree *Ramirez* did find insufficient evidence was even presented at the preliminary hearing, but I think as I said in my tentative ruling, that was—that was a different case than this; in that, it was a shooting at a birthday party. [¶] Again, like this case, there was no gang evidence as far as the actual casino. I mean, I agree with that. No words were spoken. No colors. Whatever. I've said that. [¶] But then the expert also testified that he wasn't even sure what the motive was for the shooting. It was a very different situation than we have here."[14] The trial court later adopted its tentative ruling.

### 3. Analysis

"A defendant may utilize section 995 to strike invalid enhancement allegations." (*Hale v. Superior Court* (2014) 225 Cal.App.4th 268, 271.) To prevail on a section 995 motion, the defendant must show the absence of probable cause for at least one element of the enhancement. (§ 995, subd. (a)(2)(B); *Thompson v. Superior Court* (2001) 91 Cal.App.4th 144, 148.) ""Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused."' [Citations.]" (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474.)

"[T]he showing required at a preliminary hearing is exceedingly low." (*Salazar v. Superior Court* (2000) 83 Cal.App.4th 840, 846.) Circumstantial evidence may suffice, and the evidence "need not be sufficient to support a conviction." (*Williams v. Superior Court* (1969) 71 Cal.2d 1144, 1147.) "Thus, an indictment or information should be set

---

such evidence because the people present at the party would know who was present at the party and would also know the shooters." (*Id*. at p. 221.) The appellate court determined there was "nothing inherent in the facts of the shooting to suggest any specific gang motive." (*Id*. at p. 227.)

[14]As defendant notes in his briefing, the trial court was apparently conflating the facts of *Ramirez* and *Albarran*. The *Albarran* case involved a shooting at a birthday party and *Ramirez* did not. (*People v. Albarran*, *supra*, 149 Cal.App.4th at p. 217.)

aside only when there is a total absence of evidence to support a necessary element of the offense charged." (*People v. Superior Court* (*Jurado*) (1992) 4 Cal.App.4th 1217, 1226.)

Here, as in *Ramirez*, the People's gang expert opined defendant's killing of the victim would have benefited his gang by instilling fear in the community and the gang's rivals. (*Ramirez*, *supra*, 244 Cal.App.4th at pp. 808–809.) Similar to the facts of *Ramirez*, there was no evidence defendant made his gang affiliation known to the victim or the patrons and employees of Casino Merced. Witnesses on Merced Avenue reported hearing an argument prior to the shooting, but none reported anything indicative of gang activity or that they suspected the crime was gang related.

"Across cases, appellate courts have relied on similar factors—whether the defendant's gang membership was apparent to observers, whether the victim was a gang member or rival of the defendant's gang, and whether retaliation for prior gang activity or disputes prompted the defendant's crime—to describe the limits of reputation evidence and ensure that it is grounded in specific facts that show the defendant acted on behalf of a gang rather than for personal reasons. [Citations]." (*People v. Renteria*, *supra*, 13 Cal.5th at p. 968.) None of those factors were present in this case. The trial court gave weight to the fact defendant was known to some of the casino patrons and staff, but there was no evidence any of them knew or suspected he was a gang member. Nor was there any evidence of the crime being attributed to Nuestra Familia. (Cf. *People v. Ochoa* (2009) 179 Cal.App.4th 650, 662 [reversing gang enhancement where appellant "did not call out a gang name, display gang signs, wear gang clothing, or engage in gang graffiti …. There was no evidence of bragging or graffiti to take credit for the crimes"].)

Defendant's reliance on *Ramirez* is sound, but the argument only goes so far. "Because the first prong is worded in the disjunctive, a gang enhancement may be imposed without evidence of any benefit to the gang so long as the crime was committed in association with or at the direction of another gang member." (*People v. Weddington* (2016) 246 Cal.App.4th 468, 484.) The trial court's section 995 ruling was based on the

theory of a gang benefit, which likely explains defendant's focus on the same, but the magistrate found the evidence supported a theory the murder was committed *in association with* a criminal street gang. We, of course, would be obligated to uphold the section 995 ruling if it were supported by """"any theory of the law applicable to the case … regardless of the considerations which may have moved the trial court to its conclusion."""" (*People v. Zapien* (1993) 4 Cal.4th 929, 976.) As previously indicated, the merits of defendant's section 1109 claim (see further discussion, *post*) make it unnecessary to decide whether the section 995 motion was properly denied for reasons not relied upon by the trial court.

We have addressed defendant's *Ramirez* claim because the trial court's rationale for denying the section 995 motion and for subsequently declaring the gang evidence admissible to prove motive was essentially the same. In both instances, the trial court concluded there was sufficient evidence to support a theory defendant was publicly disrespected by the victim. Like the gang benefit theory, the gang motive theory was entirely dependent upon what could reasonably be inferred from the Casino Merced videos. Defendant argues the videos do not support either theory, and we agree.

### B.    Evidence of a Gang Motive

"A 'motive' is defined as a '[c]ause or reason that moves the will and induces the action[,]' '[a]n inducement, or that which leads or tempts the mind to indulge a criminal act.' [Citation.] Motive is an intermediate fact which may be probative of such ultimate issues as intent [citation], identity [citation], or commission of the criminal act itself [citation]." (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017–1018.) Ordinarily, the existence of a motive need only be established by a preponderance of the evidence. (See Evid. Code, §§ 115, 403; *People v. Herrera* (2000) 83 Cal.App.4th 46, 61 ["the correct standard of proof for a preliminary fact under Evidence Code section 403 is evidence sufficient to support a finding by a preponderance of the evidence"]; *People v. Lynn*

(1984) 159 Cal.App.3d 715, 728 ["The general rule is motive is not an element of any crime"].)

The question presented is what inferences may reasonably be drawn from the Casino Merced videos. "An inference is a logical and reasonable deduction or conclusion to be drawn from the proof of preliminary facts. [Citations.] It is the province of the trier of fact to decide whether an inference should be drawn and the weight to be accorded the inference. … [T]o constitute an inference, the conclusion must to some degree reasonably and logically follow from the preliminary facts. If, upon proof of the preliminary facts, the conclusion is mere guesswork, then we refer to it by such words as speculation, conjecture, surmise, suspicion, and the like; and it cannot rise to the dignity of an inference." (*People v. Massie* (2006) 142 Cal.App.4th 365, 373–374.)

"Somewhere along the evidentiary spectrum, a rational inference loses its character if one or more of the premises upon which it rests, fails. When this happens, the inference becomes irrational speculation." (*People v. Bohana* (2000) 84 Cal.App.4th 360, 369.) Such is the case here regarding inferences of a motive based on defendant feeling he was publicly disrespected at the casino.

Viewed in the light most favorable to the People, the video evidence is ambiguous, *at best*, in terms of showing any type of dispute or hostility between defendant and the victim. None of the patrons or staff appeared to be paying any attention to defendant's group during the relevant segment. If people in the crowd had looked over during the period of supposedly escalating tensions, one might be able to infer there had been some type of argument or dispute. The video simply does not support that theory. Furthermore, there were at least 30 other people on the casino floor but not one person reported seeing or hearing anything noteworthy.

Officer Odom's interpretation of the video was partially based on alleged facial expressions. In his briefing, defendant argues "the video does not back up those claims." He adds, "To the extent the expressions worn by [defendant] and [the victim] can be

36.

discerned at all, they show no evidence of hostility." We agree. Frankly, defendant's face is too blurry in the video to allow for anything but raw speculation about his mental state. Even the detective who authenticated the video admitted he could not see any "angry faces" in the footage.

Any attempt to interpret the "umpire safe gesture" near the parking lot is also hopelessly speculative. The arm movements could have meant any number of things. For example, defendant claimed he was saying, "When you go to the casino and you win, you want to stop right away and just dip [leave]. Go with your winnings."

As for the hand movements inside the casino, a trier of fact could reasonably infer defendant was waving goodbye to R.Z. based on her testimony and personal knowledge of the events. Officer Odom admitted he lacked personal knowledge of what or at whom defendant was pointing. A trier of fact would be free to reject R.Z.'s testimony, but it would require speculation to conclude defendant's hand gestures specifically meant something else.

Even if the video evidence were sufficient to allow the conclusion defendant was pointing at the victim *and* that it was a hostile gesture, it would still require speculation to infer defendant did so because he felt *disrespected*. This is where the theory of a gang motive fully devolves into conjecture and guesswork. A person can be mad at someone for countless reasons other than feeling they have been publicly disrespected. Expert testimony that disrespect may motivate gang members to kill does not permit the leap of reasoning that if defendant was mad at the victim, it was more likely than not due to a perceived act of disrespect. (See *People v. Gonzalez* (2021) 59 Cal.App.5th 643, 649 ["Experts declaring unsubstantiated beliefs do not assist the truth-seeking enterprise"]; cf. *People v. Albarran*, *supra*, 149 Cal.App.4th at p. 227 ["In the final analysis, the only evidence to support the respect motive is the fact of [the appellant's] gang affiliation"].)

Reports of witnesses on Merced Avenue hearing an argument prior to the shooting provide no further support for the gang motive theory. There was certainly no evidence

that gang members argue with people only when they feel disrespected. In essence, the People's position was that gang members are more likely than nongang members to kill people who have angered them. But that is not a theory of motive; it is a propensity argument. (See *People v. Gonzalez*, *supra*, 59 Cal.App.5th at p. 649 ["A propensity for violence is logically unconnected to a decision to act for the benefit of a gang. One fact does not imply the other"].) As we discuss in the next part, there is a """"strongly entrenched"" rule that propensity evidence is not admissible to prove a defendant's conduct on a specific occasion." (*People v. Jackson* (2016) 1 Cal.5th 269, 299.)

## II.     Assembly Bill 333

### A.     Overview

In 2021, while this appeal was pending, the Legislature passed Assembly Bill 333, which took effect on January 1, 2022. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.) The legislation amended section 186.22 in several ways:

> "First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' [Citation.] Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. [Citation.] Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. [Citation.] Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' [Citation.]" (*Tran*, at p. 1206.)

"Finally, Assembly Bill 333 added section 1109, which requires, if requested by the defendant, a gang enhancement charge to be tried separately from all other counts that

38.

do not otherwise require gang evidence as an element of the crime.  If the proceedings are bifurcated, the truth of the gang enhancement may be determined only after a trier of fact finds the defendant guilty of the underlying offense." (*People v. Tran*, *supra*, 13 Cal.5th at p. 1206.)

### B.     Retroactivity

Section 3 states that no part of the Penal Code is retroactive "unless expressly so declared."  However, in *In re Estrada* (1965) 63 Cal.2d 740, an amendment to a criminal statute was held to apply retroactively despite the Legislature's failure to expressly declare such an intent.  (*Id*. at pp. 742–745.)  The rationale for this outcome is now known as the "*Estrada* rule." (E.g., *People v. Frahs* (2020) 9 Cal.5th 618, 624.)  "When new legislation reduces the punishment for an offense, we presume that the legislation applies to all cases not yet final as of the legislation's effective date." (*People v. Esquivel* (2021) 11 Cal.5th 671, 673.)

The *Estrada* rule has been applied "to statutes that merely made a reduced punishment *possible*." (*People v. Frahs*, *supra*, 9 Cal.5th at p. 629.)  In *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, the inference of retroactivity was extended to legislation that "ameliorated the possible punishment for a class of persons." (*Id*. at p. 308.)  In *Frahs*, a pretrial diversion statute (§ 1001.36) was held to apply retroactively because it "offers a potentially ameliorative benefit for a class of individuals—namely, criminal defendants who suffer from a qualifying mental disorder." (*Frahs*, at p. 631.)

Assembly Bill 333's amendments to section 186.22 have been held to apply retroactively. (*People v. Tran*, *supra*, 13 Cal.5th at pp. 1206–1207.)  However, there is a split of authority on the retroactive application of section 1109.  (Compare *People v. Burgos* (2022) 77 Cal.App.5th 550, 565–568 [holding § 1109 applies retroactively under *Estrada*], review granted July 13, 2022, S274743, and *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1131 [same], with *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [holding § 1109 is not retroactive], review granted Oct. 12, 2022, S275341, *People v.*

*Boukes* (2022) 83 Cal.App.5th 937, 948 [same], review granted Dec. 14, 2022, S277103, and *People v. Perez* (2022) 78 Cal.App.5th 192, 207 [same], review granted Aug. 17, 2022, S275090.) The issue is currently pending before the California Supreme Court in the lead case of *Burgos*.

This district has held that section 1109 applies retroactively in nonfinal cases such as this one. We reach the same conclusion here for the reasons fully stated in *People v. Ramos*, *supra*, 77 Cal.App.5th 1116 and *People v. Montano* (2022) 80 Cal.App.5th 82. The following is a summary of the analyses in those opinions.

Section 1109 contains no express declaration of retroactivity. However, there is a statement of legislative findings in an uncodified section of Assembly Bill 333. (Stats. 2021, ch. 699, § 2.) "An uncodified section is part of the statutory law." (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925.) We thus consider these legislative declarations:

> "According to the Committee on Revision of the Penal Code's 2020 report: [¶] … [¶] Gang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges which further perpetuates unfair prejudice in juries and convictions of innocent people." (Stats. 2021, ch. 699, § 2, subd. (d)(6).)

> "California courts have long recognized how prejudicial gang evidence is. [Citation.] Studies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions. [Citations.] The mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence." (Stats. 2021, ch. 699, § 2, subd. (e).)

> "Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact." (Stats. 2021, ch. 699, § 2, subd. (f).)

In *Lara*, the California Supreme Court acknowledged "*Estrada* is not directly on point" if the statute in question "does not reduce the punishment for a crime." (*People v. Superior Court* (*Lara*), *supra*, 4 Cal.5th at p. 303.) "But its rationale does apply" if the

40.

new legislation "reduces the possible punishment for a class of persons." (*Ibid*.) A possible reduction in the extent of punishment and the possibility of avoiding any punishment whatsoever are both "potentially ameliorative benefit[s]." (*People v. Frahs*, *supra*, 9 Cal.5th at p. 631.)

Section 1109 is intended to "reduce [the] harmful and prejudicial impact" of gang evidence (Stats. 2021, ch. 699, § 2, subd. (f)) and ultimately prevent wrongful convictions and unfair plea bargains (*id*., subds. (d)(6), (e)). The "increased possibility of acquittal … necessarily reduces possible punishment." (*People v. Burgos*, *supra*, 77 Cal.App.5th at p. 567, review granted.) Likewise, "[b]y reducing the pressure to accept longer sentences, [section 1109] will necessarily reduce the degree of punishment for many defendants charged with gang enhancements, even if they never have to invoke its prophylactic protections at trial." (*Ibid*.; see Stats. 2021, ch. 699, § 2, subd. (e).)

"[I]n order to rebut *Estrada*'s inference of retroactivity concerning ameliorative statutes, the Legislature must 'demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it.'" (*People v. Frahs*, *supra*, 9 Cal.5th at p. 634.) Because it "provides a possible benefit to a class of criminal defendants and the statute does not contain an express savings clause that limits the [procedures] to prospective-only application, the specific question before us boils down to whether the Legislature 'clearly signal[ed] its intent' to overcome the *Estrada* inference that section [1109] applies retroactively to all cases not yet final on appeal." (*Frahs*, at pp. 631–632.) The People fail to identify any such indicators in Assembly Bill 333 or its legislative history. For all these reasons, we conclude section 1109 applies retroactively to nonfinal judgments.

## C. Error and Prejudice

Defendant and his codefendants at trial all moved for bifurcation of the gang enhancement allegations. The motions were denied. In light of section 1109, those

41.

rulings were erroneous.  We apply the *Watson* test to determine whether the error was prejudicial.  (*People v. Tran*, *supra*, 13 Cal.5th at pp. 1208–1209.)

"[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 956.)  "The Supreme Court has emphasized 'that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.'"  (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519.)  Conviction of a lesser included offense, or a mistrial due to a hung jury, is a more favorable result than being found guilty as charged.  (*Id.* at pp. 520–521; see *People v. Walker* (2015) 237 Cal.App.4th 111, 118; *People v. Padilla* (2002) 103 Cal.App.4th 675, 679 [reversal based on reasonable probability jury would have found appellant "committed not a first degree murder but a second degree murder"].)

Section 1109 does not bar the admission of gang evidence, and its cross-admissibility for other purposes may result in jurors learning of a defendant's gang membership despite bifurcation.  (See *People v. Tran*, *supra*, 13 Cal.5th at p. 1208 ["We have held that gang evidence, even if not admitted to prove a gang enhancement, may still be relevant and admissible to prove other facts related to a crime"]; *People v. Ramos*, *supra*, 77 Cal.App.5th at p. 1132.)  "'Evidence of the defendant's gang affiliation— including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.'"  (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1022.)

"But, 'even where gang membership is relevant, because it may have a highly inflammatory impact on the jury[,] trial courts should carefully scrutinize such evidence before admitting it.'" (*People v. Gomez* (2018) 6 Cal.5th 243, 294.) "Such evidence should not be admitted if only tangentially relevant" (*People v. Gurule* (2002) 28 Cal.4th 557, 653), or "where its sole relevance is to show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense" (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449; accord, *People v. Cardenas* (1982) 31 Cal.3d 897, 904–905). "Erroneous admission of gang-related evidence, particularly regarding criminal activities, has frequently been found to be reversible error, because of its inflammatory nature and tendency to imply criminal disposition, or actual culpability." (*People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.)

The People argue "the majority of the gang evidence would have been admissible to prove the underlying charges even if the gang allegations had been bifurcated." They allege this is so because the evidence was "highly probative to issues of motive, intent to kill, and identity." The argument regarding intent to kill is not developed, but we assume it is intertwined with the motive argument. The People's briefing makes clear the latter position relies on the theory defendant "retaliated against [the victim] for perceived disrespect." We reject these contentions for the reasons stated in our analysis of the *Ramirez* claim.

The People's argument regarding proof of identity is also flawed. The admissibility of gang evidence to prove identity is not an unqualified rule. First, such evidence is admissible only if "'its probative value is not outweighed by its prejudicial effect.'" (*People v. Flores* (2020) 9 Cal.5th 371, 398.) Second, it must have a logical tendency to prove identity for reasons other than the inference of the defendant's criminal disposition. (See Evid. Code, § 1101.) For example, a defendant's gang membership would be probative of identity if the perpetrator had "'identified himself as a gang

43.

member and attempted to use that status in demanding money from the victim.'" (*People v. Ramirez* (2022) 13 Cal.5th 997, 1096, quoting *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051.) Gang evidence might also support eyewitness identifications or suspect descriptions. (E.g., *Ramirez*, at p. 1095 [holding "defendant's gang membership was relevant and admissible to bolster [the victim's] identification of defendant as one of his assailants"]; *People v. Champion* (1995) 9 Cal.4th 879, 922 ["[E]vidence that defendants were members of the same gang as other persons involved in the commission of the crimes in this case fortified the testimony of the persons who identified defendants as participants in the murders"].)

The evidence of defendant's tattoos was highly inflammatory but had no logical tendency to prove identity apart from suggesting a propensity for violence and possible willingness to kill. We are referring to the word "murder" tattooed on his left forearm; an image on his right arm of a handgun with smoke coming out of the barrel; the tattoo on his chest of a pistol being held to the back of a man's head (and whose mouth appears to be covered with duct tape); the "get MAD" and "go BAD" tattoos on his hands; and the additional firearm tattoo on the left hand. Defendant had these tattoos long before the victim's murder, which he correctly argued distinguished his case from the authority relied upon by the prosecutor, *People v. Ochoa* (2001) 26 Cal.4th 398.

In *Ochoa*, a police witness testified the appellant had "a tattoo of the number '187,' the California Penal Code section proscribing murder, which had been added *after* the charged homicides occurred." (*People v. Ochoa*, *supra*, 26 Cal.4th at p. 437, italics added.) On appeal, it was held the trial court "properly found the tattoo represented an admission of defendant's conduct and a manifestation of his consciousness of guilt. The court reasonably considered the tattoo highly probative, as it would be unlikely that an innocent person would so advertise his connection to murder." (*Id.* at p. 438.) Here, in contrast, defendant's tattoos were documented in police contacts dating back at least one year prior to the victim's death.

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159, citing Evid. Code, § 1101, subd. (a).)  Evidence Code section 1101, subdivision (b), "clarifies that the usual prohibition on propensity evidence does not preclude the admission of evidence relevant 'to prove some fact … *other than [the person's] disposition to commit such an act*,' such as the person's 'motive, opportunity, intent, preparation, plan, knowledge, [or] identity.'" (*People v. Rhoades* (2019) 8 Cal.5th 393, 414, italics added.)  "Our Supreme Court has explained that propensity evidence is prohibited not because it is irrelevant, but because it ""'is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.'""" (*People v. Jones* (2018) 28 Cal.App.5th 316, 323, quoting *People v. Jackson*, *supra*, 1 Cal.5th at p. 300.)

Again, the victim was not involved with gangs, the shooting did not occur in gang territory, no witnesses saw or heard anything gang related in connection with the murder, and there was insufficient evidence of a gang motive for the killing.  The tattoo on defendant's chest was said have an anti-snitching connotation, but there was no evidence the victim was an informant or a cooperating witness in a police investigation or legal proceeding.  No witnesses claimed to have seen the shooting, so defendant's tattoos were not relevant to any suspect descriptions or identifications.  (Cf. *People v. Young* (2019) 7 Cal.5th 905, 915, 931 [appellant's tattoos "had a tendency in reason to prove [his] identity as 'Li'l Jeff,' the man [a witness] heard discussing his involvement in the robbery murders"]; *People v. Medina* (1995) 11 Cal.4th 694, 749 [evidence appellant "had tattoos of a 'Nazi swastika and the grim reaper'" held admissible to strengthen credibility of witness who identified him as the perpetrator].)  The evidence of defendant's tattoos was probative of his identity as the shooter insofar as they suggested a criminal disposition, but it was not *admissible* for that purpose.

45.

The People unpersuasively argue that any prejudice was cured by a limiting instruction. "[W]hile we do presume the jury has endeavored to follow the court's instructions [citation], we cannot always assume that those instructions are sufficient to dispel the taint of prejudicial information. A limiting instruction warning jurors they should not think about the elephant in the room is not the same thing as having no elephant in the room." (*People v. Fritz* (2007) 153 Cal.App.4th 949, 962.) As previously noted, and further discussed *post*, the prosecution made blatant propensity arguments based on the gang evidence. Moreover, the limiting instruction told jurors the gang evidence could be considered in relation to issues of motive and identity.[15]

The prosecutor displayed photos of defendant's tattoos during opening argument, noting the image of "a man shooting another man in the back of the head. … On his hands, 'Get Mad, Go Bad.' And on his forearm, 'Murder.'" The photos were twice displayed during the prosecution's case-in-chief and discussed on direct examination of two law enforcement witnesses. Early in the People's closing argument, the prosecutor said, "Another undisputed fact is that Defendant … has these tattoos on his body. … [T]he man shooting another man in the back of the head…."

Later in the closing argument, the prosecutor said, "When you shoot someone in the back of the head, that is to make sure that they are dead once and for all. Those are the acts of a cold-blooded killer. And that cold-blooded killer is [defendant]. [¶] And

_____

[15]The trial court instructed the jury pursuant to CALCRIM No. 1403, a limiting instruction on the use of gang evidence that does not—in either its standard or optional bracketed language—include identity as a relevant issue for which such evidence may be considered. The trial court modified the instruction sua sponte to read, in pertinent part: "[Y]ou may consider evidence of gang activity … when deciding the identity of the person who shot [the victim]." This modification is the subject of defendant's claim of instructional error. The People argue the claim was forfeited by defendant's failure to object to the modification at trial. But the People concede the issue of whether the gang evidence could be used to prove identity was "litigated during motions in limine." While defendant may have forfeited the claim of instructional error (an issue we do not reach), it does not follow that the modified CALCRIM No. 1403 instruction cured any prejudice resulting from the admission of evidence that would have otherwise been excluded if the defense motions for bifurcation had been granted.

when you're thinking about the fact that [the victim] got shot in the back of the head and you're still asking yourself, 'Well, who really shot him?' remember the tattoo on [defendant]'s chest that depicts someone being shot in the back of the head, the exact same manner in which [the victim] was killed."[16]

The tattoos were subsequently referenced a third time: "[W]e've already talked about the tattoos he has on his body—'Murder,' the shooting, 'Make Money,' 'Go Bad,' demonstrating the primary activities of the gang, not to mention the 'XIV' across his abdomen." This segued into a discussion of the wiretap call, which the prosecutor described as, "Some of the most valuable evidence that you heard that shows you exactly what [defendant] is all about, what he stands for, his allegiance to this criminal street gang." The jury was reminded of defendant's prior involvement in "different drug sales, disciplining other gang members," and "discussing 'hits' on other members."

Following a 90-minute recess, the prosecution's closing argument resumed with further discussion of the tattoos: "[W]hen you're deciding whether or not Defendant … was the person who murdered [the victim], you can consider gang evidence, which brings us back to [defendant]'s tattoos. [¶] [Defendant], plain and simple, is a walking billboard for the Norteños and Nuestra Familia criminal street gang and what they stand for. Money, murder, shootings, these are all primary activities of the gang, and this is what

---

[16]The manner-of-death argument was dubious. The number of expended bullet casings at the crime scene indicated the shooter (or shooters) had fired 11 rounds. Five of the shots missed, and a sixth "graze[d]" the victim. Of the five shots on target, one entered "his right wrist or forearm," another struck him in "the front of the left shoulder, …one [entered] the left lower back and one [entered] in the—kind of right lower backside area." The coroner's testimony provided no information regarding the order of the shots or the distance from which they were fired (e.g., the presence of soot or stippling). A single bullet entered the back of the victim's skull, but the record does not suggest an execution-style killing in "the exact same manner" as depicted on defendant's chest tattoo. (Cf. *People v. Barnwell* (2007) 41 Cal.4th 1038, 1056–1057 ["To be admissible on the issue of identity, an uncharged crime must be highly similar to the charged offenses, so similar as to serve as a signature or fingerprint.… [¶] Defendant's previous possession of a weapon, even of a similar weapon, is not so distinctive on these facts as to serve as a signature or a fingerprint supporting a conclusion that because he had committed the earlier offense he must have committed the one for which he was on trial"].)

[defendant] chooses to display on his body. Most importantly, the tattoo on his chest shows the man shooting someone else in the back of the head. (Indicating.) [¶] As I stated earlier, we know that [the victim] was shot in the back of the head." (See fn. 16, *ante*.)

In concluding remarks, the prosecutor made a final propensity argument based on defendant's tattoos: "And we all know what happens when [defendant] gets mad. When [defendant] gets mad, things go bad, ladies and gentlemen. And that's exactly what happened that night. He got mad, and he used a gun to murder [the victim]."

The wiretap call was discussed again in the prosecution's rebuttal argument: "[Defendant]'s phone call alone is enough to tell you about his ongoing criminal street gang activities. He talked about the different drug sales, heroin, meth, different types of money, different amounts, different crimes, putting hits on people, going to intimidate a witness that was somehow named in a trial. Those are things that were just discussed in a 15-minute phone call."

In his briefing, defendant argues the "repetitive drumbeat … about the violence and criminal activities of the NF and Nortenos, [his] status in those gangs and [his] tattoos, hammered home the message that [he] was someone who'd committed crimes in the past, would likely commit crimes in the future and therefore most likely committed this crime." We cannot disagree. A central theme of the People's case was that a person involved in the activities discussed on the wiretap, and who would tattoo his body with words and imagery of murder, was more likely to have killed the victim than someone who had not done those things.

Some evidence of defendant's gang membership may still have been admitted because of the gang allegations against Annabelle and Olvera. At least with regard to Olvera, there was a plausible motive for him to help a higher ranking gang member avoid prosecution for the victim's murder. Even so, it is unlikely the most inflammatory tattoo evidence and portions of the wiretap recording would have withstood scrutiny under

Evidence Code section 352. Assembly Bill 333's changes to section 186.22 and the enactment of section 1109 also raise the possibility of a different ruling on defendant's motion to sever his case from the trial of all three codefendants.

The People lastly argue the jury's rejection of the count 1 gang enhancement demonstrates the harmlessness of the bifurcation error. They rely on *People v. Williams* (2009) 170 Cal.App.4th 587. In *Williams*, a not guilty verdict on a charged offense and a not true finding on one of multiple gang enhancement allegations (*id*. at p. 595) showed "the jury did not accept the gang evidence and prior crimes evidence uncritically" (*id*. at p. 613). There, however, "[t]he admissible evidence overwhelmingly established defendant's guilt of the substantive offenses and the truth of the [remaining] gang enhancement allegations." (*Ibid*.)

The evidence against defendant was not overwhelming. The People's case was entirely circumstantial, though still relatively strong given defendant's sudden disappearance from the area following the murder. Nevertheless, there were no eyewitness; the murder weapon was never recovered; no guns or ammunition were found in the victim's home; there was no evidence defendant, Karla, or Annabelle owned firearms; there was no scientific evidence linking defendant to the crime; and there was no apparent motive for the killing. The People's briefing also ignores the significance of witness A.D.'s account of seeing a four-door vehicle turning onto Rose Avenue.

As discussed, the Merced Avenue video came from a home security camera located between Rose Avenue and Almond Avenue. It showed a white two-door vehicle—presumably defendant's Cadillac—driving east toward the victim's residence at 23:21:28 on the video clock. At 23:25:38 on the video clock, a white *four-door* vehicle passed by the camera heading in the same direction, i.e., toward the victim's home. Defendant's vehicle appeared again at 23:28:42 on the video clock, now moving west. The detective who authenticated the video testified the video clock was approximately one minute slow. In other words, defendant's Cadillac passed the 1200 block of Merced

Avenue, moving west, at approximately 11:29 p.m. The first 911 call came in at 11:31 p.m. But as explained in footnote 6, *ante*, the detective did not record the interim footage and failed to preserve the original video. There was no way of knowing if other vehicles entered or exited the neighborhood around the time of the shooting.

As shown in maps used at trial and explained by witness testimony, a vehicle proceeding west from where the victim's body was found can only make one of three possible turns: a right onto northbound Rose Avenue, a right onto northbound Almond Avenue, or a right or left onto northbound or southbound Motel Drive. If it turned on Rose, it would not have appeared on the video because the camera was located west of Rose and east of Almond. Put differently, any car seen passing the camera in the westbound lane of Merced Avenue must have necessarily turned on either Almond Avenue or Motel Drive.

The lead detective, when asked, "[D]o you have to turn off of Merced Avenue to get onto Motel Drive?" explained, "Well, it kind of turns into it. There's a—if you're going westbound on Merced Avenue, there's a stop sign right here.… [¶] … [¶] And then if you just keep going straight, you'll run right into it." It is an oddly configured three-way intersection in that a car making a 90-degree right turn would be turning onto Almond Avenue, not Motel Drive. Witness F.G. claimed to have seen a white car "stopped at the stop sign" before it "took off" "going towards the Marriott." The defense suggested the car F.G. saw may have turned right on Almond Avenue instead of merging onto northbound Motel Drive.

A.D. lived on Merced Avenue at the time; F.G. did not. A.D. was confident they had seen a white four-door vehicle turn right onto Rose Avenue. He said this to investigators at the crime scene and again in his recorded interview, which was played for the jury. The recording contained these statements:

"Q: Are you sure it went down Rose and not down Mere- uh, Motel Drive?

50.

"A: No, I saw it go down Rose.

"Q: So it turned on Rose.

"A: Yeah.

"Q: Okay. Um, and that's the—that's the—the street at the stop sign, right?

"A: Mm, the street before it.

"Q: The street before the stop sign.

"A: Yeah.

"Q: Okay.

"A: So it's like where the guy's body was and it's like probably three houses and then it's Rose right there.

"Q: So it didn't go to the stop sign?

"A: No.

"Q: The—then—okay. And you're—are you positive?

"A: Yeah."

Security cameras at businesses along Motel Drive captured video of a northbound vehicle closely resembling defendant's white Cadillac at approximately 11:30 p.m. The People argued the victim's killer was inside the white car seen by F.G. and A.D. However, if the white car those witnesses saw turned on Rose Avenue, it could not have been defendant's Cadillac.

The discrepancy in F.G.'s and A.D.'s accounts was additionally important in relation to the timing of the events. The jury was not told whether F.G. placed the first or second 911 call, but we will assume it believed his was the first, i.e., the 11:31 p.m. call. After answering several of the dispatcher's questions, F.G. made a statement that arguably suggested the white vehicle was at the crime scene at the very beginning of the call. He referred to the car in both the past and present tense: "There's a white ca—it

51.

was a—it was a white Cadillac.  It's—I don't know if it's—if this is the car."[17] According to the People's theory, defendant's Cadillac entered Motel Drive at approximately 11:29 p.m. and was already up at the Courtyard Marriot, close to Yosemite Parkway, at 11:30 p.m.  Defendant noted the timing issues during closing argument, saying, "The shots fired call was at 11:31.  I don't know if you guys know how long it takes to go one or two blocks, but it is not three minutes long."  (See fn. 6, *ante*.)

In summary, conflicting evidence suggested it was possible defendant's Cadillac was already on Motel Drive before the victim was shot.  If the white vehicle seen by F.G. and A.D. was involved in the shooting but turned onto Rose Avenue, the shooter may have been someone other than defendant.  Also, the puzzling circumstance of the victim being shot and killed two blocks away from his home was never explained.  This, combined with the evidence of the unidentified woman in the area prior to the shooting and Karla's daughter confessing to the crime, may explain why it took the jury so long to reach its verdicts.  The evidence supporting count 3 was not overwhelming either, as it showed Karla might have been trying to purchase ammunition for Fernando Luna, not defendant.

"Juror questions and requests to have testimony reread are indications the deliberations were close."  (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295.) Lengthy deliberations may compel the same conclusion.  (See *People v. Cardenas*, *supra*, 31 Cal.3d at p. 907 [12 hours of deliberations in an attempted murder trial described as "a graphic demonstration of the closeness of this case"]; accord, *In re Martin* (1987) 44 Cal.3d 1, 51 [citing additional examples].)  The *Cardenas* opinion notes the California Supreme Court "has held that jury deliberations of almost six hours are an indication that

---

[17]Similarly, in A.D.'s recorded interview, he said, "Yeah it was stopped.  Like, it was completely stopped and then we saw the body and then the car took off once—once we started running, like, towards that direction.  The car took off and then it turned on to Rose and then the—the neighbor came out and then *we were on the phone already with the—with 911*."  (Italics added.)

the issue of guilt is not 'open and shut' and strongly suggest that errors in the admission of evidence are prejudicial." (*Cardenas*, *supra*, at p. 907.)

Defendant's jury deliberated for approximately 18 hours over the course of four days, periodically asking to review certain evidence. While length of time may simply indicate a jury's "conscientious performance of its civic duty" (*People v. Walker* (1995) 31 Cal.App.4th 432, 438), it is hard to ignore the question submitted by this jury on the second day of deliberations: "If [defendant] is not found guilty can Anabelle … and … Olvera be found guilty of accessory after the fact?" Considering the totality of the circumstances, as detailed in the foregoing analysis, it is reasonably probable defendant would have achieved a more favorable outcome but for the denial of his motion to bifurcate the trial of the gang enhancement allegations. He is therefore entitled to a new trial.

**DISPOSITION**

The judgment is reversed.


PEÑA, J.

WE CONCUR:


FRANSON, Acting P. J.


SMITH, J.